2022 IL App (1st) 210807-U

No. 1-21-0807

Order filed June 10, 2022

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 12606 |
| | ) | |
| NORVIN ORTIZ, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's sentence of 40 years' imprisonment is affirmed over his contention that his sentence is excessive in light of mitigating factors.

¶ 2    Following a bench trial, defendant Norvin Ortiz was convicted of first degree murder and sentenced to 40 years' imprisonment. On appeal, defendant contends that his sentence is excessive in light of the mitigation evidence he presented to the trial court. We affirm.

¶ 3    Defendant was charged by indictment with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2008)) in connection with the death of Bree Gregory on January 18, 2009. Because defendant does not challenge the sufficiency of the evidence to sustain his conviction, we recount the facts to the extent necessary to resolve the issue raised on appeal.

¶ 4    At the time of Gregory's death, defendant was living in Chicago and had previously been working in construction but was unemployed. On the evening of January 18, 2009, he was drinking in a bar and used his cell phone to call Gregory, whom he had previously met for sex in exchange for payment. Gregory called him back shortly after 10 p.m. and agreed to accept $50 in exchange for sex. Gregory's friend Gary Stein drove her to 47th Street and Drake Avenue to meet defendant. According to Stein, Gregory was struggling with drug addiction and earning money as a prostitute.

¶ 5    According to defendant's testimony at trial, Gregory got into his Toyota 4Runner at the meeting spot and directed him to drive to "an empty place" nearby. After defendant parked, she asked him for the $50, which he gave her. They got into the back seat, and she took off her pants. Defendant then "realized [he] couldn't have sex because [he] was too drunk." He asked her for the $50 back, they argued, and she started hitting him. She hit him on the forehead and mouth, breaking his tooth, whereupon he "started grabbing her hands, and [they] started fighting." As they struggled, she was lying down in the back seat; defendant was kneeling on the floor of the vehicle. She scratched his face and arms. Defendant, who is five foot five inches tall and weighed 200 pounds at the time, then "grabbed her throat and *** pressed it" for "[o]ne or two minutes." After she stopped scratching him and was no longer moving, he "threw her out" of his car and "left her there." She landed in a snowbank. Defendant did not check on her or call the police. He drove to

his apartment, and, after realizing Gregory's property, including her cell phone, was still in his vehicle, he disposed of it into a nearby garbage can so the police would not find it.

¶ 6    At about 11:30 p.m., Alma Robles was backing into a parking spot when she saw, through her car window, Gregory's body, lying, with her pants down, on snow overlying the street and sidewalk in the 4600 block of South Drake Avenue. According to the testimony of a responding officer and photographic evidence, Gregory's body was nude from the waist to the knees.

¶ 7    Defendant's friend Sergio Ortiz testified that the following morning he accompanied defendant to withdraw his unemployment benefits from ATMs. The next day, defendant asked Sergio—in whose name defendant's cell phone was registered—to change the number, and, soon after that, to cancel the service. Sergio observed marks on defendant's face and scratches on his neck, although defendant was "wearing a hoodie pretty snug."

¶ 8    Defendant's roommate at the time, Jose Sosa-Jordan, testified that in January 2009 defendant asked to meet and gave him $200 or $300 to wire to an individual in Guatemala. Although defendant was wearing both a hoodie and a baseball cap, Sosa-Jordan observed that the area under one of his eyes was red.

¶ 9    Defendant's brother, Roir Ortiz Vasquez, testified that in January 2009 defendant called and asked him to pick up defendant's clothing and 4Runner from his apartment. Roir did so, and defendant retrieved the vehicle and clothing from Roir's home later that same day. Roir observed that defendant's face was "all scratched up."

¶ 10    To explain his injuries, defendant told all three men that he had been robbed by "two black guys."

¶ 11    The police, upon reviewing Gregory's cell phone records, attempted to locate defendant. However, he fled to Guatemala, where he remained for three years.

¶ 12    Based on a police investigation, a warrant for defendant's arrest was issued on April 11, 2009. On May 20, 2017, defendant was arrested on that warrant, having been found near Denver, Colorado, living under an assumed name and using false identification. He was extradited from Colorado and transported to a police station in Chicago, where he consented to a buccal swab for DNA testing and gave a videotaped statement in Spanish. In that statement, he did not indicate that Gregory had attacked him. According to the translation admitted into evidence, defendant told police he knew Gregory was dead when he removed her from his vehicle.

¶ 13    The State introduced autopsy evidence. At the time of her death, Gregory was 29 years old, was five foot five inches tall, and weighed 133 pounds. The cause of death was strangulation. Dr. Ponni Arunkunar, chief medical examiner of the Cook County Medical Examiner's office, estimated that if Gregory were strangled with minimum pressure sufficient to cause death, she would have been unconscious within 10 to 30 seconds and dead within two and one-half to six minutes. Toxicology results revealed metabolites of cocaine and of heroin (including morphine), but, according to Dr. Arunkunar, the quantities and timing of use could not be determined. Gregory had several injuries that Dr. Arunkunar testified were consistent with strangulation, such as petechia in the eyes, facial and neck abrasions, and hemorrhages in the neck muscles, as well as defensive wounds on both of Gregory's hands which were consistent with attempting to pry from her neck the fingers of an attacker. No evidence of cold exposure was seen. Male profile DNA evidence identified from fingernail and vaginal swabbings indicated, to a high probability, that defendant was the donor.

¶ 14    The trial court found defendant guilty of first degree murder. The court's findings of fact included that defendant picked Gregory up for a "date" and that they "got into an argument" when he wanted his money back. Rejecting defendant's argument that he should be found guilty of second degree murder, the court noted that even if Gregory scratched him, this did not justify his act of choking her to death, and that he failed to use the limited amount of force that would have been necessary to stop her. Further, defendant's subsequent conduct—throwing her body out of the car, discarding her belongings, canceling his cell phone, and fleeing the country—were not consistent with murder in the second degree:

> "These weren't the actions of a person who believed that his actions were justified. He realized that what he did was wrong, that he had killed her, and he knew that there was not any justification for his actions. He also knew even if he did not intend to kill her that his actions created a strong possibility of her death or great bodily harm."

¶ 15    Defendant filed a motion for reconsideration of the finding of guilty or for a new trial. After hearing arguments on the motion, the court denied it. In doing so, the court rejected defendant's argument that he acted under a sudden and intense passion that would justify a finding of second degree murder. Rather, the court stated that it had considered all of the evidence, the injuries sustained by defendant and Gregory, and "the state in which she was left in the snow with her skirt or bottom pulled down." The court concluded the State met its burden of proof beyond a reasonable doubt as to the crime of first degree murder.

¶ 16    On May 27, 2021 the court tendered to defense counsel the presentence investigative report (PSI). The report showed that defendant had been born in Guatemala, had been raised primarily by his mother after his father died in a car accident, and had completed only the second grade. Defendant reported that he had grown up "very poor" and had been physically abused by friends

of his family as a child. He had first come to the United States in 2001 and was 30 years old at the time of the offense. He denied any history of drug or alcohol problems. He had no prior criminal background, and, at the time of his arrest in the instant case, had been employed full-time for two years as a construction worker in Colorado and providing for his daughter, who defendant stated was 11 years old at the time of the PSI report.

¶ 17    For purposes of sentencing, the State presented, in aggravation, a March 29, 2019, jail surveillance video. According to the record of proceedings, the video showed defendant and another inmate standing near a microwave, whereupon defendant made a movement with his arm that caused something to hit the other inmate in the face.[1] Defense counsel disagreed as to the actions depicted in the video, and the court agreed to watch it again. The State presented Officer Herrera, a City of Chicago employee assigned to the jail, who identified both men on the video and identified the other inmate in photographs that show a person with what appear to be facial injuries. Herrera testified that he saw the inmate shortly after the incident and that his face appeared to have "burns" and looked "reddish" and "gooey[,]" and "worse" than the photographs depicted. Herrera also testified that medical attention for the inmate was sought.

¶ 18    The State argued, based on the jail surveillance video, that defendant "is somebody who, when they get angry, they snap." The State pointed out that based on the trial testimony, Gregory's strangulation took "a long time and a lot of strength[,]" after which she was "thrown out onto the street like a piece of trash as [defendant] flees to Guatemala." Noting that the court had already declined to impose an extended-term sentence, the State requested "the upper reaches of" the standard sentencing range.

---

[1] This video was not admitted as an exhibit.

¶ 19    Additionally, the State presented Gregory's father, Weston, who read a victim's impact statement, recounting Gregory's struggle with addiction and the effects of her death on the family, particularly her daughter, who was 15 years old at the time of sentencing. Weston asked that defendant be punished to the fullest extent of the law.

¶ 20    In mitigation, defense counsel reiterated that defendant had no prior criminal history and that he fled the country because he was "scared" rather than to avoid prosecution. The defense characterized the incident leading to Gregory's death as "a once-in-a-lifetime event."

¶ 21    Defendant declined the opportunity to make a statement in allocution.

¶ 22    In imposing sentence, the court noted it "considered the facts in aggravation and mitigation." Facts in aggravation included "the crime itself." Consistent with the findings the court had made in finding defendant guilty of first degree murder, the court reiterated that Gregory, a prostitute, was with defendant voluntarily. He and Gregory had a "fight or argument" when he was unable to have sex and wanted his money back, although "it was not her fault that he could not perform." Noting that no one was present to witness such fight or argument, the court stated:

> "But irrespective of how the fight started, the way it ended was indicative of, first of all, first degree murder as I've already found. But it was also aggravating to throw her out of the car, throw her body in the snow, half clothed was just demeaning. So it's not like he got angry, got upset, had a fight with her, and then realized that what he did was wrong and tried to get her help or tried to contact the police. He didn't do any of that. He just threw her body out into the snow and fled. So of course that's aggravating."

¶ 23    The court noted that defendant's lack of prior criminal history was "definitely mitigating." Considering all factors in aggravation—"the crime itself, the way she was left, and the fact that he fled to Guatemala and then returned back to the United States to the state of Colorado and not to

Illinois"—as well as "the factors in mitigation, his lack of criminal history," the court imposed a sentence of 40 years' imprisonment.

¶ 24    Defendant filed a motion for reconsideration of the sentence, arguing it was inconsistent with the proportionate penalties clause of the Illinois Constitution (see Ill. Const. 1970, art. I, § 11) given his "past history or criminality, mental history, family situation, economic status, education, [and] occupational or personal habits." At a hearing on the motion, defense counsel argued that the killing of Gregory was neither premeditated nor motivated by revenge, and that defendant had fled to Guatemala in fear. In response, the State noted that the 40-year term imposed by the court was within the 20- to 60-year sentencing range for the offense, and justified given the seriousness of the crime. Gregory had "fought for her life" and had been left by the roadside with her pants down, while defendant fled the country.

¶ 25    The court denied defendant's motion to reconsider the sentence. In doing so, the court explained: "Even if *** it was a situation or fight or argument gone bad, the way he ended it was very cruel and unnecessary. In addition to that, he fled to Guatemala for eight years and when he returned to the United States he went to a different jurisdiction." The court noted, again, that in sentencing it had considered defendant's lack of prior criminal history.

¶ 26    On appeal, defendant contends his 40-year sentence was excessive.

¶ 27    The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; see *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 48 (citing Ill. Const. 1970, art. I, § 11; *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27). In balancing these considerations at sentencing, the trial court must consider several aggravating and

mitigating factors, including " 'the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education.' " *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46 (quoting *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992)); see 730 ILCS 5/5-5-3.1 (West 2020) (factors in mitigation); 730 ILCS 5/5-5-3.2 (West 2020) (factors in aggravation). At a sentencing hearing, the trial court need not recite each factor and the weight assigned thereto, and is presumed to have considered all relevant factors and any mitigation evidence. *Neasom*, 2017 IL App (1st) 143875, ¶ 48 (citations omitted).

¶ 28    A reviewing court may not modify a defendant's sentence absent an abuse of discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36 (citing *People v. Alexander*, 239 Ill. 2d 205, 212 (2010)). "Ultimately, when a sentence falls within the applicable statutory guidelines, it is presumed to be proper and will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense." *People v. Himber*, 2020 IL App (1st) 162182, ¶ 59 (citing *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010); *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004)). A reviewing court gives substantial deference to the trial court's sentencing decision because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider the relevant factors. *Snyder*, 2011 IL 111382, ¶ 36 (citing *Alexander*, 239 Ill. 2d at 212-13). Absent an indication to the contrary, other than the sentence itself, the appellate court must presume the trial court properly considered all relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. The reviewing court may not reverse the sentencing court just because it

would have weighed the factors differently. *People v. Scott*, 2015 IL App (1st) 131503, ¶ 48 (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991)).

¶ 29    Here, defendant was convicted of first degree murder, an offense for which the standard range for imprisonment is 20 to 60 years. 730 ILCS 5/5-4.5-20(a) (West 2020). The trial court sentenced defendant to 40 years. The sentence is squarely within the prescribed sentencing range and thus is presumptively proper. *Himber*, 2020 IL App (1st) 162182, ¶ 59 (citations omitted).

¶ 30    Nevertheless, defendant argues that his sentence was excessive given his demonstrated rehabilitative potential. He also maintains that the court failed to consider his self-defense as mitigation. In his reply brief, defendant states that the "crux of [his] argument" is that although the judge acknowledged some of the mitigating evidence he presented, the sentence "does not show that the judge actually acted on the mitigation and rehabilitation factors."

¶ 31    After reviewing the record, we find that the court did not abuse its discretion in sentencing defendant to 40 years' imprisonment for first degree murder. While the trial court was not required to expressly address any specific factors in mitigation (*Neasom*, 2017 IL App (1st) 143875, ¶ 48), the record shows it considered the complained-of factors. In imposing sentence, the court noted it "considered the facts in aggravation and mitigation." Specifically, as to defendant's claim of self-defense, the court, in finding him guilty of first degree murder, rejected his contention that he was justified in choking Gregory to death, even accepting his version of events that he killed her during a fight or argument over the payment. In finding defendant guilty, the court also noted that his actions following Gregory's death were "not the actions of a person who believed that his actions were justified." At sentencing, the court pointed out that, as it had "already found[,]" irrespective of how the fight started, the way it ended was indicative of first degree murder.

¶ 32 The court also expressly considered defendant's lack of criminal history, and even stated that this factor was "definitely mitigating." See 730 ILCS 5/5-5-3.1(a)(7) (West 2020). Although the court did not expressly address defendant's work history, defendant argued in his motion to reconsider that his sentence was "not in keeping with" his "economic status" and "occupational *** habits." The court denied defendant's motion and is presumed to have considered all relevant factors presented for its consideration. *Neasom*, 2017 IL App (1st) 143875, ¶ 48.

¶ 33 Relatedly, we reject defendant's argument that his claimed "long history" of working and of providing for his daughter shows his rehabilitation potential in that he "led a law-abiding life for a substantial period of time before the commission of the present crime" (730 ILCS 5/5-5-3.1(a)(7) (West 2020)), and that the trial court failed to consider such factors. According to the record, including the PSI, he was unemployed when he killed Gregory, and his daughter had not yet been born. In any event, his rehabilitation potential "is not entitled to greater weight than the seriousness of the offense." (Internal quotation marks omitted.) *Knox*, 2014 IL App (1st) 120349, ¶ 46 (quoting *Alexander*, 239 Ill. 2d at 214). Indeed, the seriousness of the offense is the most important sentencing factor. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. Here, the court recounted the facts of the case and pointed out that, after strangling Gregory to death, defendant left her body in a manner that was "just demeaning[,]" neither came to her aid nor sought the police, and fled to avoid justice.

¶ 34 Given this record, defendant essentially asks this court to reweigh the evidence presented in mitigation and aggravation and to substitute our judgment for that of the trial court. This we cannot do. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000) (citing *Streit*, 142 Ill. 2d at 19). As noted, absent an indication to the contrary, we must presume the trial court properly considered all

relevant mitigating factors. *Sauseda*, 2016 IL App (1st) 140134, ¶ 19. Here, the record shows that the court did so.

¶ 35 In reaching this conclusion, we briefly note defendant's argument that the State's evidence in aggravation—video and testimony regarding a fellow inmate's facial burns—does not clearly indicate that defendant intentionally caused such injury. However, because defendant did not object to the publication of the video, either at the sentencing hearing or in a written postsentencing motion, any argument that the evidence was improperly admitted or considered is forfeited.[2] *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) (citations omitted).

¶ 36 Finally, we reject the notion, as argued in defendant's reply brief, that his childhood poverty and abuse at the hands of family friends—noted in the PSI—supports a reduction of his sentence. In support of this argument, defendant relies on *People v. Busse*, 2016 IL App 142941, where this court reduced the sentence of a homeless defendant whose theft of $44 from a vending machine was seemingly "motivated by poverty." *Id.* at ¶ 34. However, this court may not engage in cross-case comparative sentencing upon a challenge to a sentence. See *People v. Fern*, 189 Ill. 2d 48, 55 (1999). Moreover, defendant's history of childhood poverty and abuse are not factors included in the statute that sets forth mitigation factors in sentencing. See 730 ILCS 5/5-5-3.1(a) (West 2020). In any event, as mentioned, the trial court is presumed to have considered the information included in defendant's PSI.

---

[2] At the sentencing hearing, defendant made an objection, which the court sustained, to the State's attempt to characterize the contents of the video and the publication of photographs to the extent that the State sought to introduce testimony by Officer Herrera regarding the videotaped incident, which he did not witness. In his motion to reconsider sentence, defendant did not allude to this or any other aggravating evidence.

¶ 37    In sum, defendant has failed to overcome the presumption that his 40-year sentence is proper. Stated differently, defendant has not made an affirmative showing that his 40-year sentence is at variance with the purpose and spirit of the law, or manifestly disproportionate to the nature of his offense. See *Himber*, 2020 IL App (1st) 162182, ¶ 59.

¶ 38    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 39    Affirmed.