2025 IL App (1st) 221600
No. 1-22-1600
Order filed February 21, 2025

Sixth Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except for the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) |  |
| v. | ) ) | No. 21 CR 09341 |
| JESUS AYALA, | ) ) |  |
| Defendant-Appellant. | ) ) ) | The Honorable Charles P., Burns, Judge, presiding. |

**RULE 23 0RDER**

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Tailor and Justice C.A. Walker concurred in the judgment.

¶ 1     *Held:* Defendant properly found guilty in bench trial with two eyewitnesses and bodycam video as corroboration; concurrent sentences were proper after sentencing court weighed aggravating and mitigating factors.

¶ 2     After a bench trial, Jesus Ayala was convicted of aggravated discharge of a firearm (720 ILCS 5/24-1.2 (a)(2) (West 2020)); aggravated unlawful use of a weapon without a valid license under the Firearm Concealed Carry Act (720 ILCS 5/24-1.6 (a)(1), (3) (A-5) (West 2020) (count 3); and aggravated unlawful use of a weapon without a valid Firearm Owners Identification card

(720 ILCS 24-1.6(a)(1)/(3)(C)) (count 4). The trial court sentenced Ayala to nine-and-a-half years' incarceration for aggravated discharge of a firearm. After merging count 4 with count 3,` the court sentenced Ayala to two-and-a-half years' imprisonment on count 3, to be served concurrently.

¶ 3    4    He appeals, arguing the State failed to prove 3the offense beyond a reasonable doubt and that his sentences were improper. We affirm.

¶ 4    The State established guilt beyond a reasonable doubt through eyewitness testimony and police officers' bodycam videos. The trial court properly imposed concurrent terms of incarceration after considering aggravating factors—seriousness of the offense and his juvenile delinquency history, and mitigating factors—troubled social background, history of substance abuse, family's dependence on his employment, and his rehabilitative potential.

¶ 5                            Background

¶ 6    The State's evidence at trial consisted of the testimony of the two arresting officers, Antonio Gudinez and Joel Soto, and bodycam videos of the arrest.

¶ 7    On June 12, 2021, at about 11 p.m., while on patrol in an unmarked car in "gang territory," Chicago police officers followed a car that was driving "fast" but could not identify its model, color, or the number of people in the car. Nor did they see the car's license plate. Officer Soto was in the front passenger seat, and Officer Gudinez was in the back seat on the driver's side. (Officer Christopher Valdez, who was driving, did not testify). The officers were in uniform and had their car windows open.

¶ 8    Soto testified that he heard three to five gunshots as they turned a corner. He focused on the car at that point. Seconds later, Soto saw Ayala "on the street near the curb area" and did not see anyone else. Ayala moved onto the "grassy area" and ran north. Soto did not know where Ayala was when the gunshots were fired and did not see muzzle flashes.

¶ 9 After letting out Gudinez, Soto and the other officer followed Ayala for about 100 feet, at which point Soto jumped from the car and arrested Ayala. Two to four additional officers arrived and searched for, but did not find, shell casings. The police called area hospitals to ask if anyone came in with a gunshot wound, but no one had. Soto and the officers also looked for property damage.

¶ 10 Soto testified, "During that time, there was an individual there who said he heard some type of ricochet. He noticed a truck window was shot towards the back, the pickup truck."

¶ 11 Gudinez testified that from the rear seat behind the driver, he saw Ayala standing on the side of the street near the curb. On cross-examination, Gudinez said Ayala was "near the street," on the "grassy area" near the curb. Ayala was holding a firearm, and Gudinez saw him raise his arm. Gudinez heard "multiple loud reports of like a firearm being discharged," saw muzzle flashes, and smelled gunpowder. Gudinez said he never lost sight of Ayala. Police recovered a .22 caliber semi-automatic handgun at the curb, which was not introduced into evidence. Police did not recover shell casings nor conduct forensic or gunshot residue testing on Ayala's hands or clothing.

¶ 12 Gudinez's bodycam video shows the police car speeding up, turning a corner 20 seconds later, and Gudinez getting out and giving chase a few seconds later. Within 10 seconds, the video shows Ayala stop running and hitting the ground and Gudinez handcuffing him. The parties stipulated that Jesus did not have a FOID card or CCL.

¶ 13 Ayala presented no witnesses in his defense.

¶ 14 Finding Ayala guilty on all counts, the trial court stated: "I believe the police officers did, in fact, observe this shooting."

¶ 15 *Sentencing*

¶ 16        At the sentencing hearing, Ayala's mother and his fiancé made allocution statements that Ayala was employed, a father, and two credits short of a high school diploma.

¶ 17        In aggravation, the State argued that serious harm threatened a residential area with cars lining the street. Ayala also had a criminal history and was on probation.

¶ 18                                *Presentence Investigation Report*

¶ 19        According to the presentence investigation report, Ayala was convicted in 2019 for aggravated unlawful use of a weapon when he was 20 years old, had a DUI conviction in 2018, and juvenile adjudications for aggravated battery in 2017 and armed robbery in 2014.

¶ 20        Ayala's father left the family when he was 12, and Ayala had not seen him since. Ayala began using cannabis at age 14 and alcohol at age 17. There was frequent firearm violence in his neighborhood, a high crime rate, and readily available narcotics. Ayala was diagnosed with ADHD, which made learning difficult. He attended high school for four years and took special education classes, saw a school counselor for three years, and took medication for one year. At the time of his arrest, Ayala worked full-time plus overtime for a packaging company in suburban Chicago. He hoped to earn his GED.

¶ 21        During sentencing, the trial court noted the range of years for the AAUW was from 4 to 15 years. The trial court found that "emerging medical science" showed that an "emerging adult's cognitive decision-making" was still developing, so a 15-year term would be inappropriate as it would "basically tell everybody that you don't have an opportunity to change, which I don't agree with." The trial court stated it considered (i) all the factors in aggravation and mitigation, both statutory and non-statutory, (ii) the factors used in sentencing of juveniles and emerging adults under *Miller v. Alabama* and its progeny, and (iii) Ayala's "repeated pattern of violence"

before imposing a two and one-half year concurrent prison term for the AAUW-CCL. The trial court addressed Ayala directly:

> "[Y]ou have an opportunity to make some changes. If you want to get involved with the people that are never going to do anything proper in life, you can hang with them and you can get mulled down and you can get stepped on and you can get entrenched in that lifestyle or you can do something to better yourself for when you get out. Because the bottom line is whoever you may be running with on the street until now, they're not here in this courtroom. They're not here supporting you. And the people that are supporting you are the people in the hard benches here. You have to realize that you are a man now, and you have to act like a man, and you have to be responsible. And the last thing your child needs is to grow up without a father. You're going to get out on this case, not as soon as you want but you have some opportunity to not only change but to also influence other people to take positive routes instead of taking them down dark allies. I wish you the best of luck sincerely, sir."

¶ 22    Ayala moved for a reduction of sentence, which the trial court denied. Then, because he was on first-time weapon offender probation for constructive possession of a firearm, Ayala stipulated to violating probation and was sentenced to a concurrent three-year term of imprisonment.

¶ 23                                Analysis

¶ 24    A claim of insufficient evidence will be sustained when, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Bradford*, 2016 IL 118674, ¶ 12. The same test applies regardless of whether the evidence is direct, circumstantial, or the defendant received a bench or jury trial. *People v. Cooper,* 194 Ill. 2d, 419, 431 (2000); *People v. Meyers*, 2018 IL App (1st) 140891, ¶ 29.

¶ 25    The reviewing court will not reverse a conviction simply because the evidence is contradictory or the defendant claims a witness was not credible. *People v. Siguenza Brito*, 235 Ill. 2d 213, 228 (2009). But "[t]he deference given to the trier of fact's determinations has limits; the

reviewing court may reverse a conviction where the evidence "is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *People v. Campbell*, 2019 IL App (1st) 161640, ¶ 19 (citing People v. Wheeler, 226 Ill. 2d 92, 115 (2007)."

¶ 26      Where the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 279. "The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who saw and heard the witness." *Id*. at 280. Under this standard, eyewitness testimony may be found insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Gray*, 2017 IL 120958, ¶ 36 (quoting *Cunningham*, 212 Ill. 2d at 280.

¶ 27                                          *Reasonable Doubt*

¶ 28      Ayala argues the State failed to prove him guilty beyond a reasonable doubt because (i) the officer's testimony against him was not credible, and (ii) the police failed even minimally to investigate the incident, including a viable suspect in the area at the time of the incident.

¶ 29      The statute defines the offense of "Aggravated discharge of a firearm" as: "A person commits aggravated discharge of a firearm when he or she knowingly or intentionally * * * [d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person * * *." 720 ILCS 5/24-1.2 (a)(2) (West 2020). An aggravated unlawful use of a weapon without a valid license occurs when a person knowingly carries "on or about his or her person * * * any pistol, revolver, stun gun or taser or other firearm * * * uncased, loaded, and immediately accessible at the time of the offense and the person possessing" it "has not been issued a currently valid license under the Firearm Concealed Carry Act." 24-1.6(a)(1); 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2020).

¶ 30    To prove Ayala guilty beyond a reasonable doubt of aggravated discharge of a firearm, the State had to show that he discharged a firearm in the direction of another person or vehicle he knew, or reasonably should have known, was occupied. 720 ILCS 5/24-1.2(a)(2) (West 2020). Regarding the aggravated unlawful use of a weapon without a valid license, the State must prove that Ayala carried a firearm on his person without a valid FOID card or concealed carry card. 720 ILCS 5/24-1.6(a)(1), (A-5), (B-5) (West 2020). The parties stipulated that Ayala had neither.

¶ 31    Ayala contends that the State failed to prove his possession of a firearm or that he was the perpetrator of the shooting. Ayala invites this court to consider Soto's account as "undermining" Gudinez's credibility that he saw Ayala shoot. According to Ayala, as the officers' squad turned the corner, both Soto and Gudinez lost sight of the speeding car. He emphasizes that Soto did not see Ayala shoot or muzzle flashes and that Gudinez, sitting behind the driver, would have had an obstructed view, leading to a mistaken identification of Ayala as the shooter.

¶ 32    The State responds sufficient evidence supports the convictions, characterizing the two officers' testimony as having "a minor discrepancy" and that Gudinez's testimony alone suffices to sustain the conviction, citing *People v. Evans*, 2009 Ill. 2d 194, 209, 211 (2004) ("reversal is not warranted simply because the defendant alleges 'that a witness was not credible' or that the [trier of fact] assigned too much weight to a particular piece of evidence")

¶ 33    We find that the trial judge properly considered all the evidence—the testimony of Officers Soto and Gudinez and their bodycam footage. We agree with the State that the discrepancies between the two accounts did not rise to the level of creating a reasonable doubt. To be reasonable, an inference must arise from a realistic evaluation of the evidence, reasoning to a conclusion from established facts, avoiding suspicion, imagination, conjecture, or subjective impressions. *People v. Johnson*, 2024 IL App (1st) 220494, ¶ 81 (citing *People v. Davis*, 278 Ill. App. 3d 532, 540

(1996) ("If an alleged inference does not have a chain of factual evidentiary antecedents, then within the purview of the law it is not a reasonable inference but is instead mere speculation.").

¶ 34    The officers' accounts establish that Ayala was the individual who fired shots. Officer Soto testified that as he approached the intersection, he heard gunshots and, within moments, saw Ayala on the east side of Millard. Initially focused on the speeding car, Soto quickly shifted his attention to Ayala near the curb before fleeing north. Officer Gudinez corroborated this account, having seen Ayala extend his arm and hearing multiple loud reports consistent with gunfire.

¶ 35    Their narratives complement each other, particularly in the timing: Soto described the shots being fired "simultaneous to us getting there and turning," which aligns with Gudinez seeing Ayala discharging a firearm. Further, in Soto's body camera footage, Soto can be heard yelling, "Drop it!" as he pursues Ayala, indicating that Ayala was armed and attempting to flee. Gudinez's video shows the firearm being recovered along Ayala's flight path, establishing a link between Ayala and the firearm. The recovered firearm had a chambered round, supporting that it had been fired.

¶ 36    Soto testified the back window of a nearby truck sustained damage consistent with the shots fired at the speeding vehicle. The recovered firearm was "hot to the touch," and the area smelled of gunpowder. Gudinez testified to seeing smoke emanating from the firearm immediately after it discharged, while Soto noted muzzle flashes, further linking Ayala to the act of firing.

¶ 37    Moreover, Ayala's behavior during and after the incident reinforces the evidence against him. In Soto's video, he had a bandana over his face, indicating an effort to conceal his identity.

¶ 38    Gudinez's bodycam video shows the police car speeding up, turning a corner 20 seconds later, and Gudinez getting out and giving chase moments later. Within 10 seconds, Ayala stops running and falls to the ground, where Gudinez handcuffs him.

¶ 39    While Ayala asserts that Soto's testimony should be weighed more heavily due to his focus on the speeding car, this argument fails to diminish Gudinez's credibility. Their differing positions—Soto in the front passenger seat and George behind the driver in the back—could explain the slight discrepancies in their observations. Ayala further asserts that Soto's attention was drawn to the speeding dark sedan as he heard gunshots, making it "more likely that the sound of gunfire was coming from the car" and not from Ayala. This is a bridge too far, given Gudinez's testimony that he saw Ayala shoot and Soto's that he saw Ayala running immediately after hearing three to five gunshots.

¶ 40    Ayala also argues that the officers minimally investigated the incident, citing the lack of forensic testing or follow-up on investigating the speeding car "despite evidence that its occupants were viable suspects as the source of gunfire." In addition, the police conducted no ballistics fingerprint or DNA tests on the small caliber handgun found near the curb or found shell casings. Yet, Soto's testimony about a ricochet sound and the damaged pickup truck window does not demonstrate an incomplete or incompetent investigation. Besides, the absence of evidence does not imply the nonexistence of proof.

¶ 41    Ayala references *In re Nasie M.*, 2015 IL App (1st) 151678, where a conviction was reversed due to lack of forensic or medical evidence connecting the defendant to the offense, despite the trial court's finding that the State's witness was credible. Unlike *Nasie M.*, which involved a confession, here videos substantiate what the police observed.

¶ 42    Giving great deference to the trier of fact's determinations regarding the weight of the evidence and witness credibility, we uphold the trial court's assessment of the testimony. See *Cunningham*, 212 Ill. 2d at 280 ("unless the "evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt").

¶ 43                                    *Excessive Sentence*

¶ 44         The trial court sentenced Ayala to nine-and-a-half years in prison for aggravated discharge of a firearm, a sentence falling at the mid-point of the authorized range, with a concurrent sentence of two-and-a-half years for aggravated unlawful use of a weapon. Ayala asks us to reduce his sentence, contending that the trial court placed undue weight on the seriousness of the offense and his juvenile delinquency history. He further argues the court failed to adequately consider mitigating factors, including his troubled social background, history of substance abuse, family's dependence on his employment, and rehabilitative potential.

¶ 45         A reviewing court may reduce a sentence when the record establishes that the trial court abused its discretion. *People v. Streit,* 142 Ill.2d 13, 19 (1991). A reviewing court may not reverse because it would have weighed the factors differently. *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 28. The reviewing court considers the record as a whole rather than isolated statements. *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 55 (citing *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22). See *People v. Lintz*, 245 Ill.App.3d 658, 669 (1993) ("proper penalty must be based on the particular circumstances of the individual case").

¶ 46         After thoroughly reviewing the record, the briefs, and the presentence investigation report (PSI), we find no basis to disturb the sentencing decision. The record reflects that the trial court carefully balanced the aggravating and mitigating factors and imposed a sentence appropriate to the offense and Ayala's criminal history. Indeed, the trial judge was the same judge who had placed Ayala on probation for a prior weapon offense. Our supreme court in *People v. Fern* decreed that a trial judge may, in fashioning a sentence, consider his or her knowledge of the sentences imposed in other cases. *People v. Fern*, 189 Ill. 2d 48, 62 (1999).

¶ 47 Ayala argues that the court gave undue weight to the seriousness of the offense. We disagree. The aggravated discharge of a firearm is a serious offense, made more so by bystanders, including one individual so alarmed that he dropped his phone and fled. Contrary to Ayala's claim that "no evidence" indicated "that anyone else had been in the line of fire," the presence of bystanders justifies the court's focus on the gravity of the offense. See *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 55 (sentencing judge may consider nature and circumstances of offense and extent of each element of offense).

¶ 48 The trial court also appropriately considered Ayala's criminal history as an aggravating factor as authorized by statute. See 730 ILCS 5/5-5-3.2 (3) (West 2020) ("Factors in aggravation and extended-term sentencing. *** [T]he defendant has a history of prior delinquency or criminal activity."). Ayala committed the offenses while on probation for a gun-related offense. Additionally, his juvenile record includes armed robbery and aggravated battery of a police officer. These offenses demonstrate a pattern of violent behavior that the trial court properly took into account in crafting its sentence.

¶ 49 Furthermore, the trial court appropriately considered Ayala's substance abuse issues. The record shows that Ayala has untreated substance abuse problems, which includes a DUI. A sentencing judge is allowed to view a defendant's substance abuse as an aggravating factor with no mitigating value. See *People v. Ballard*, 206 Ill. 2d 151, 190 (2002). Notably, Ayala's statements in the PSI acknowledged using alcohol and marijuana; however, his counsel at sentencing mentioned Ayala also used cocaine. This indicates that Ayala may have downplayed the extent of his substance abuse, further supporting a mid-range prison sentence.

¶ 50 Additionally, the trial court did not overlook Ayala's rehabilitative potential or relevant mitigating factors. The court specially addressed Ayala's potential for rehabilitation, emphasizing

the importance of considering how his actions could affect his child, who might grow up without a father. The sentence reflects a thoughtful balance between the seriousness of the offense, Ayala's criminal history, and his potential for reform. Lastly, the trial court's comments to Ayala were appropriate, measured, and entirely fitting in the context of sentencing, with the hope that they might have a positive impact on him. At stated in *People v. Streit*, 142 Ill. 2d 13, 21 (1991), the trial court has authority to "balance these [mitigating] factors and make a reasoned decision as to the appropriate punishment in each case."

¶ 51         Affirmed.